# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CR-22-03-H-BMM |
| vs. | **ORDER** |
| MATTHEW PHILLIP HAMPER, | |
| Defendant. | |

## INTRODUCTION

Defendant Matthew Phillip Hamper ("Hamper") has filed a motion to suppress all evidence obtained by law enforcement and any derivative evidence resulting from a search of a recreational vehicle located at the same residence as his house on July 7, 2022. (Doc. 17.) State law enforcement conducted a warrantless search of Hamper's house pursuant to conditions of his parole. Hamper contends that law enforcement lacked probable cause to conduct a separate warrantless search of a recreational vehicle parked at the residence. (Doc. 18.) Hamper also asserts that the Fourth Amendment requires law enforcement to obtain a warrant for the search of the recreational vehicle. *Id*. The Government

opposes the motion. (Doc. 22.) The Court held a hearing on the matter on August 17, 2022. (Doc. 25.)

## BACKGROUND

Hamper was convicted of criminal possession of dangerous drugs in the First Judicial District Court, Lewis and Clark County, Montana on November 14, 2019. (Doc. 18 at 2.) The state court sentenced Hamper to eleven years in the Montana State Prison with five suspended. (*Id.*) Hamper also was convicted in the Fifth Judicial District Court, Jefferson County, Montana, on April 3, 2019, for criminal possession of dangerous drugs. (*Id.*) The state court sentenced Hamper to five years in the Montana State Prison to run concurrently with his Lewis and Clark County sentence. (*Id.*)

Hamper was granted parole on August 6, 2020, subject to specific conditions. (*Id.*) Hamper agreed to all Standard Conditions, Statutory Conditions, and Recommended Special Conditions. (Doc. 17-1 at 2-4.) Specifically, Hamper agreed, subject to Standard Condition #10, to "make my home open and available for officers to visit or search upon reasonable suspicion." (Doc. 17-1 at 2.) Hamper also agreed to Standard Condition #11 that "[u]pon reasonable suspicion, as ascertained by a Probation/Parole Officer, my person, vehicle, and/or residence may be searched at any time, day or night, including my place of employment, without a warrant by a Probation/Parole Officer, ISP Officer, or Law Enforcement

Officer." (*Id.*) Condition #11 states that any "illegal property or contraband will be seized." (*Id.*)

Hamper had been residing with his parents at 1241 Highway 282, near Montana City, Montana while on parole. (Doc. 18 at 2.) The one-acre property consisted of one main house, two outbuildings, two recreational vehicles, and an assortment of other vehicles at the time of the search on July 7, 2022. (Doc. 22-3.)

An informant indicated to the Missouri River Drug Task Force ("MRDTF") in January of 2021 that they could purchase methamphetamine from Hamper. (Doc. 22 at 4.) MRDTF conducted a controlled purchase from Hamper at an arranged location. (Doc. 22-4.) Hamper arrived at the location in a maroon Pontiac Grand Prix and sold the informant two baggies of methamphetamine weighing 4.2 grams and 4.3 grams. (Doc. 22-4 at 3.) MRDTF officers observed a supplier arriving in an older model brown sedan while conducting another controlled purchase of methamphetamine on June 8, 2021. (Doc. 22-5 at 2.) The supplier gave the dealer a quantity of suspected methamphetamine, and the dealer sold a weighed quantity to the informant. (*Id.*) Two days later, MRDTF officers conducted another operation to purchase methamphetamine from the same drug dealer. The supplier arrived in a maroon Grand Prix bearing the same license plate previously identified on the brown sedan during the controlled purchase on June 8, 2022. (*Id.*)

3

MRDTF began surveilling Hamper's parole-registered residence at 1241 Highway 282 in June 2021. (Docs. 17-2 at 1; 22-5 at 2; 22-6.) Sergeant Matt Reighard observed a maroon Grand Prix parked in front of a recreational vehicle at the residence. (Doc. 22-6 at 2.) MRDTF believed the recreational vehicle to be "the area where Matthew [Hamper] inhabits on the property." (*Id.*) Sergeant Reighard also observed a brown sedan that matched the description of the vehicle involved with the earlier controlled purchase of methamphetamine on June 8, 2022. (*Id.*) Sergeant Reighard took photographs of the area, but a tree obstructed the view of the front of the recreational vehicle. (*Id.*) Sergeant Reighard noted in his surveillance report that he observed two people leave the recreational vehicle and enter the Grand Prix. Officers applied for and obtained a warrant on June 30, 2021, to place a GPS tracking device on the maroon Grand Prix. (*Id.*) Officers observed Hamper around the area of the recreational vehicle, entering and exiting the Grand Prix, as well as entering and exiting the recreational vehicle. (*Id.*); (Doc. 22-13 at 2.)

Sheriff Craig Doolittle of the Jefferson County Sheriff's Office contacted Hamper's parole officer, Deanna Lougee, after having received a tip that Hamper possessed a large quantity of methamphetamine on July 6, 2021. (Docs. 22-8 at 7 & 22-7.) At this point, Hamper already had violated the conditions of his parole for

4

failing to report to law enforcement, associating with a felon without permission, and failing to report to his parole officer. (Doc. 22-8 at 7–8.)

Officer Lougee and three additional parole officers arrived at Hamper's residence on July 7, 2021, to conduct a parole search. (Doc. 22-9 at 1.) Hamper indicated to the officers that he was the sole occupant of the residence at the time. (*Id.*) Hamper told the officers that his parents were out camping. (Doc. 22-10 at 1.) The officers confirmed that Hamper's parents were camping by looking at a calendar hanging on the wall that indicated they would be at the Hellgate campground at Canyon Ferry Lake until July 9, 2021. (*Id.*) Hamper also stated that his brother Joe was out of town. (Doc. 22-9 at 2.)

The officers informed Hamper that they would be conducting a search due to his noncompliance with his parole conditions. (Doc. 22-9 at 1.) The officers found no evidence of parole violations in the room that Hamper claimed to be his bedroom. (*Id.*) The only items in the bedroom that appeared to belong to Hamper were the clothing in the closet and wardrobe closet. (*Id.*) Stuffed animals and pillows were placed on the neatly made bed, as well as a pile of laundry. (*Id.*; Doc. 22-11.) A large ironing board with clothes draped over it and a large, flatscreen TV box stood in front of the bed. (*Id.*; Doc. 22-11.) Office Nathe noted that it "obviously did not look like someone was staying in this room." (Doc. 22-10 at 1.)

Officer Lougee reported, "It did not appear this room was being used to sleep in." (Doc. 22-9 at 1.)

Officer Lougee requested that Hamper provide a urine sample for testing. (Doc. 22-9 at 1.) Hamper admitted that he would test positive for methamphetamine when the officers asked him to provide the urine sample. (*Id*.) Hamper also informed the officers that his parents knew he had been using drugs and assumed that he had drugs in the home. (*Id*.)

The officers observed a lock box key on the counter in Hamper's home. (Doc. 22-9 at 1.) The officers asked Hamper what the lock box key opened. (*Id*.) Hamper denied knowing what the lock box key opened. Hamper suggested that there was a lock box in the spare bedroom. (Doc. 22-8 at 6.) Officer Lougee found a lock box in the spare bedroom. (*Id*.) The key did not fit the lock box in the spare bedroom. (*Id*.)

Officer Lougee then informed Hamper that the officers would conduct a search of the Grand Prix and requested his keys. (*Id*. at 5.) Hamper presented his keychain to the officers. (*Id*.) Hamper's keychain contained a key to his Grand Prix and two other keys. (*Id*.) The officers proceeded to search the maroon Grand Prix. (*Id*.) The officers found a can of bear spray in the Grand Prix and confiscated it. (*Id*.)

Officer Lougee then asked Hamper about the recreational vehicles and other vehicles on the property. (Doc. 22-9 at 2.) Hamper stated that the brown Lincoln and recreational vehicles belonged to his brother Joe. (*Id*.) Joe was not present, and Hamper claimed not to know where Joe was. (*Id*.) The officers asked Hamper whether the other keys on the keychain Hamper had provided would open the recreational vehicle. (*Id*.) Hamper told the officers that two keys on the keychain were not his and he was unsure what they unlocked. (*Id*.) Hamper specifically denied that the keys would open the recreational vehicle. (*Id*.)

The officers noted that the air conditioner was running inside the recreational vehicle parked immediately next to the shed on the west side of the residence even though Hamper was the only one at the residence. (*Id*.) Officer Lougee approached the recreational vehicle, and after knocking without an answer, used one of the keys on Hamper's keychain to unlock the door. (*Id*.) Officer Lougee documented a strong smell of marijuana upon entering the recreational vehicle. (*Id*.) The officers searched the recreational vehicle and located a lock box. (*Id*.) They inserted the lock box key found on the main home's kitchen counter to open the lock box. (*Id*.) The lock box contained several ounces of suspected methamphetamine. (*Id*.)

The officers also found the following items during their search of the recreational vehicle: shot gun shells; a homemade gun; glass pipes; a glass mirror

7

bearing a white, crystal like powder with varying size crystals, a spoon, and razor blades; a backpack containing two pounds of suspected marijuana; a shotgun and .22 caliber handgun; ammunition; a wallet containing a debit card with Hamper's name; a box containing cell phones, a scale, plastic baggies, and bags containing large white crystals; and several electronic devices. (*Id*.) Officers also found a baggie containing a large white crystal on Hamper's person. (*Id*. at 3.)

Hamper provided a urine sample that tested positive for methamphetamine, amphetamine, and MDMA. (*Id.*) Officers arrested Hamper. (*Id*.) Officers eventually obtained a search warrant to search the cellphones and other electronic devices. (Doc. 22-13.)

A federal grand jury issued an Indictment against Hamper. (Doc. 1.) The Indictment charges Hamper with four crimes: Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C §841(a)(1) (Count I); Distribution of Methamphetamine, in violation of 21 U.S.C §841(a)(1) (Count II); Felon in Possession of Firearms and Ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count III); and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5845(a) and 5861(d) (Count IV). (*Id.*)

## LEGAL STANDARD

The Fourth Amendment safeguards the right of people from unreasonable searches and seizures. U.S. Const. amend. IV. Evidence proves admissible if law

enforcement's search and seizure has complied with federal constitutional standards. *See United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987); *Elkins v. United States*, 364 U.S. 206 (1960). The defendant bears the burden of showing that a search conducted pursuant to a warrant was unlawful. *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

## ANALYSIS

**I. Whether Hamper retains standing to challenge the search at issue.**

Before analyzing the merits of the search, the Court first must determine whether Hamper retained a legitimate expectation of privacy in the recreational vehicle. A person must possess a legitimate expectation of privacy in the area searched to establish standing to challenge the legality of a search pursuant to the Fourth Amendment. *Rakas v. Illinois,* 439 U.S. 128, 143 (1978). The expectation of privacy must prove reasonable in that the defendant must demonstrate an actual subjective expectation of privacy that society is prepared to recognize. *Minnesota v. Carter*, 525 U.S. 83, 88 (1994); *Minnesota v. Olson¸* 495 U.S. 91, 95-96 (1990).

The Government argues that Hamper cannot show that he possessed an actual subjective expectation of privacy in the recreational vehicle as he informed the parole officers that the recreational "vehicle belonged to his brother, that it was locked, and that he did not have access it to it." (Doc. 22 at 11.) The Government

contends that Hamper's arguments attempt to "dispel" any claim that Hamper had access to or any possessory interest in the recreational vehicle. (*Id.*)

Hamper need not possess an ownership interest to assert protection under the Fourth Amendment. The Ninth Circuit determined in *United States v. Davis* that the defendant had standing to challenge law enforcement's seizure of drugs from a safe in a friend's apartment when the defendant had a key to the apartment, was free to come and go as he pleased, stored things there, and had independent access to the place searched. 932 F.2d 752, 757 (9th Cir. 1991). The Ninth Circuit concluded that the defendant's "partial or joint control over the premises . . . remains significant under the expectation of privacy standard." *Id*. (internal quotation marks omitted). The U.S. Supreme Court made a similar ruling in *Rakas*. *Rakas* recognized that a person using a premises could claim the protection of the Fourth Amendment with respect to governmental invasion, "even though his interest in the premises might not have been a recognized property interest at common law." *Rakas*, 439 U.S. at 143 (internal quotation marks omitted).

MRDTF previously observed Hamper entering and exiting the area near the recreational vehicle multiple times. Officer Lougee used Hamper's keys on his personal keychain to enter the recreational vehicle. Hamper has established that he maintains some legitimate expectation of privacy in the place searched as he had access to a key and demonstrated that he was free to come and go as he pleased,

10

even if he told the officers that he retained no ownership in the recreational vehicle. *Davis*, 932 F.2d at 758.

## II. Whether the search violates Hamper's Fourth Amendment rights.

Parole officers lawfully may conduct searches of parolees or their residences without satisfying the Fourth Amendment's warrant requirement when a parolee remains subject to a condition authorizing warrantless searches. *United States v. Grandberry*, 730 F.3d 968, 973 (9th Cir. 2013). Officers must have "probable cause to believe that the parolee is a resident of the house to be searched" before conducting a warrantless search of a residence pursuant to parole conditions. *Id*. Probable cause may be met when the "totality of circumstances" would lead someone of "reasonable caution" to believe that the parolee lives at the residence in question. *U.S. v. Flores*, 288 Fed.Appx. 365, 366 (9th Cir. 2008) (unpublished) (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)).

If the officers establish probable cause, then they may search any area included in the conditions without a warrant. *Grandberry*, 730 F.3d at 973. The law requires officers to obtain a warrant to search an area other than the areas specified in the conditions of parole. *Id.* at 981. Hamper had been subject to a warrantless search of his person, vehicle, and/or residence pursuant to his parole conditions. (Doc. 17-1 at 2.) The parties agree that Hamper resided at 1241

Highway 282. Probable cause existed that Hamper lived at the address where the officers conducted the search.

The Government argues that once probable cause had been established, officers needed only to establish reasonable suspicion to search areas on the property that exist as common space or areas under the Hamper's exclusive control. (Doc. 22 at 12.) The Government argues the correct standard, but misstates the analysis of *United States v. Dixon.* 984 F.3d 814 (9th Cir. 2020). *Dixon* provides two significant distinctions relevant to the warrantless search of a parolee's vehicle subject to parole conditions.

First, the Ninth Circuit distinguished between the degree of knowledge law enforcement must have to search an object within a parolee's residence, subject to parole search conditions, and an object outside of the residence. *Dixon*, 984 F.3d at 822–23. The Ninth Circuit applied the reasonable suspicion standard to property located inside the parolee's residence. *Id.* at 822. When officers conduct a search outside of the parolee's residence, however, law enforcement must make an initial probable cause determination whether the parolee owns or controls that property, such as a vehicle. *Id.* at 823.

Second, the Ninth Circuit distinguished the standard required for law enforcement to conduct a warrantless search of a parolee's vehicle subject to parole conditions based on the vehicle's location. *Id*. The more stringent "probable

cause as to residence" rule extends to a vehicle search when questions exist regarding the parolee's control over the vehicle. *Id*. For example, the more stringent "probable cause" standard would apply to a vehicle parked in a separate garage not connected to a residence, or parked at an unassigned parking space in an open parking lot. *Id*. The warrantless search of a minivan in an open parking lot outside a multi-family apartment complex in *Dixon* required that law enforcement first establish probable cause to protect the privacy interests of innocent third parties. *Id*. at 822. In contrast, law enforcement must meet only the lower reasonable suspicion standard if the vehicle is parked at the parolee's registered residence or in a garage connected to the registered residence. *Id*. at 823 n. 5.

The recreational vehicle at issue sat immediately next to the shed on the west side of the house at Hamper's registered residence. (Doc. 22-8 at 6.) Officer Lougee needed only reasonable suspicion that Hamper owned or controlled the recreational vehicle subject to the warrantless search. The officers did not conduct the search of the recreational vehicle in an open parking lot outside an apartment complex where it would have been difficult to discern who owned or controlled the vehicle. *Cf. Dixon*, 984 F.3d at 822–23. The recreational vehicle had been parked between a shed and the house at Hamper's registered residence throughout MRDTF's surveillance. (Docs. 22-6 & 17-2.)

13

The officers located the recreational vehicle at Hamper's parole-registered residence when they conducted the parole search on July 7, 2022. (Doc. 22-9 at 2.) It proves irrelevant that the recreational vehicle had not been parked in an assigned parking spot, as might be common at an urban apartment complex. The 1-acre open property that Hamper had identified to parole officers as his residence did not list assigned parking spots. The officers found the recreational vehicle parked at Hamper's parole-registered residence between a shed and the main house. (Doc. 22-3.)

Officer Lougee possessed reasonable suspicion to conduct a warrantless search of the recreational vehicle subject to Hamper's parole conditions. Reasonable suspicion exists when an officer can "point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion requires more than a mere hunch, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officer Lougee relied on MRDTF's earlier surveillance, the confidential informant tip communicated to Sheriff Doolittle, the officers' search of the main home, and information that Hamper had provided the officers to

14

establish reasonable suspicion that Hamper exercised control over the recreational vehicle and conducted criminal activity within it.

Officer Lougee knew that Hamper kept methamphetamine inside the recreational vehicle. Sheriff Doolittle had communicated that a confidential source informed him that Hamper "has 2 baggies with 16oz of meth in each and 2 pounds of marijuana in his camper parked next to his parent's garage, where he is living." (Doc. 22-8 at 7.) Hamper admitted that his urine sample would have resulted in a positive test for methamphetamine. (Doc. 22-9 at 1.)

Officer Lougee searched a bedroom that Hamper claimed as his in the main house before Officer Lougee searched the recreational vehicle. Officer Lougee suspected from the state of the bedroom that it had not been used for sleeping. (Doc. 22-9 at 1.) Hamper's personal keychain held two keys that Hamper claimed were not his although the other key on the keychain, in fact, belonged to him. (*Id.* at 2.) Neither Hamper's parents nor his brother Joe were home, and yet the air conditioner inside the RV had been running. (*Id.*) Taken altogether, these facts indicate that Officer Lougee possessed reasonable suspicion to search the recreational vehicle.

Even if Hamper could prove that his brother Joe owned the recreational vehicle subject to the warrantless search, Officer Lougee possessed reasonable suspicion that Hamper had joint control of the recreational vehicle sufficient to

15

conduct the search. The Ninth Circuit generally has recognized that a parole condition permitting warrantless searches provides officers with authority to enter and search a house where the parolee resides, even if others also reside there. *See Motley v. Parks,* 432 F.3d 1072 (9th Cir. 2005). The officers must limit the scope of any parole search, as with other searches, to those areas of a residence over which the officers reasonably believe that the probationer exercised complete or joint authority. *United States v. Matlock*, 415 U.S. 164, 170–71 (1974).

Joint authority rests on the "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n.7. Officers must have reasonable suspicion to conclude that the probationer owns, controls, or possesses a particular item in order to conduct a search. *United States v. Bolivar*, 670 F.3d 1091, 1096 (9th Cir. 2012) (citing *United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991)). Applying these principles to the parole search here, the Court determines that Officer Lougee had reasonable suspicion to conclude that Hamper had access to, and used, the recreational vehicle to the degree that he exercised joint authority.

MRDTF and Sherriff Doolite provided Officer Lougee with information that Hamper lived, and kept large quantities of methamphetamine, in the recreational vehicle. (Doc. 22-8 at 7.) Hamper's personal keychain held keys to unlock the recreational vehicle. (Doc. 22-9 at 2.) The air conditioner in the recreational

vehicle was operating even though Hamper's parents were out of town and Hamper's brother was not there. (*Id.*) The facts available to the officers, taken together, supported a reasonable belief that Hamper had at least common use and joint authority over the recreational vehicle. This reasonable belief permitted Officer Lougee to conduct a search of the recreational vehicle at Hamper's residence as part of the warrantless parole search. *Bolivar*, 670 F.3d at 1096.

Hamper argues that the Fourth Amendment requires officers to establish separate probable cause that Hamper resided in the recreational vehicle. Hamper asserts that the recreational vehicle located at the address he reported to his parole officer as his residence constitutes a separate residence from the main house on the property. (Doc. 18.) Hamper compares the parole search of the recreational vehicle at Hamper's residence to law enforcement's parole search of the defendant's girlfriend's apartment in *Grandberry*. 730 F.3d 968. The Ninth Circuit determined in *Grandberry* that law enforcement lacked probable cause to search the apartment belonging to the defendant's girlfriend. The defendant had not reported the girlfriend's apartment as his residence to his parole officer. *Id*. at 980. The Ninth Circuit concluded that the defendant's possession and use of a key to access the apartment, on its own, proved insufficient to show that a person lives in the place to which the key grants access. *Id*. at 979.

The unlawful warrantless parole search in *Grandberry* differs fundamentally, however, from the warrantless parole search of the recreational vehicle even if the Court were to treat the recreational vehicle here as a residence rather than a vehicle. Law enforcement in *Grandberry* conducted a warrantless search at an unreported, third-party residence. Law enforcement failed to demonstrate sufficient facts to meet the probable cause standard to allow for the warrantless search of the girlfriend's apartment located miles from the defendant's address registered with probation. *Id.* at 980.

Unlike *Grandberry*, the recreational vehicle searched at Hamper's residence had been parked on the same one-acre lot next to the house at the same address that Hamper had registered with his parole officer. (Doc. 22-9 at 1.) Hamper's parole Condition #11 states that "[u]pon reasonable suspicion, as ascertained by a Probation/Parole Officer, my person, vehicle, and/or residence may be searched at any time." (Doc. 17-1 at 2.) Hamper accordingly was not merely an "overnight guest" at the registered address, a status which would have required officers to establish probable cause to search the recreational vehicle. *Grandberry*, 730 F.3d at 971. The recreational vehicle represented part of the same residence subject to Hamper's parole conditions that authorized a warrantless search under these circumstances. The parole officers needed only reasonable suspicion to search the recreational vehicle at Hamper's residence. *Davis*, 932 F.2d at 758.

18

## ORDER

Accordingly, **IT IS ORDERED** that Hamper's Motion to Suppress (Doc. 17) is **DENIED**.

Dated the 19th day of September, 2022.

_____
Brian Morris, Chief District Judge
United States District Court