IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>MATTHEW PHILLIP HAMPER,<br><br>Defendant/Movant. | Cause No. CR 22-03-H-BMM<br><br><br>ORDER |

Pro se prisoner Matthew Phillip Hamper ("Hamper") has filed a Motion to Vacate Judgment pursuant to 28 U.S.C. § 2255. (Doc. 74.) Hamper challenges the 180-month sentence imposed upon him after he pled guilty to the two counts contained in his indictment: Possession with Intent to Distribute Methamphetamine and Possession of an Unregistered Firearm. Hamper now challenges his sentence based upon ineffective assistance of trial counsel ("IAC").

## I.     Preliminary Review

Before the United States is required to respond, the Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The Court reviews the § 2255 "motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack[.]" Rule 4(b), Rules Governing Section 2255

1

Proceedings for the United States District Courts. A district court must summarily dismiss a § 2255 application "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." *Id.* A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). The Court should "eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II.    Background

The Government charged Hamper with Possession with Intent to Distribute Methamphetamine (Count I), Distribution of Methamphetamine (Count II), Felon in Possession of Firearms and Ammunition (Count III), and Possession of an Unregistered Firearm (Count IV). (*See* Indictment Doc. 1.) Federal Defender Michael Donahoe initially represented Hamper. Federal Defender Shenandoah Roath assumed representation of Hamper on June 21, 2022. (*See e.g.* Doc. 11, Doc. 13.)

Roath filed a motion to suppress all the evidence seized from Hamper's

2

recreational vehicle ("RV") following a warrantless state probation/parole search. Hamper's RV sat parked on the same property as his family's residence. (Docs. 17 & 18.) The search of Hamper's RV resulted in the recovery of the methamphetamine, guns, and ammunition that led to his federal charges. The Court held a hearing on Hamper's suppression motion on August 17, 2022. (*See* Minute Entry Doc. 25.) The Court subsequently issued a written order denying the suppression motion. (Doc. 35.)

Hamper then filed a motion to change his plea along with a written plea agreement. (Doc. 37, Doc. 38.) The Court held a change of plea hearing on October 18, 2022. (*See* Minute Entry Doc. 42.) Hamper pled guilty to Count I and Count IV of the Indictment and pled true to the forfeiture allegation. The Court found that Hamper was competent to enter the pleas and accepted the guilty pleas. (*Id.*)

Roath filed a Sentencing Memorandum and letters of support of Hamper. (*See* Doc. 49, Doc. 50.) Notably, in the Sentencing Memorandum, Hamper challenged the drug weight calculation contained in the Presentence Report ("PSR"). Hamper argued that the drug seizure and ensuing transport to federal authorities did not follow a proper chain of custody and that the final weight attributed to Hamper did not match the weight initially recovered by the Jefferson County Sheriff's Office during the initial search of the RV. (Doc. 50 at 2-8.)

Hamper asserted that the explanation provided by DEA agents regarding the drug weight irregularities did not cure the discrepancies.  Hamper contended that the total methamphetamine weight and corresponding base level offense of 36, as calculated in the PSR, was inflated and lacked reliable support. Hamper argued that his base level offense instead should have been 34 and reflected the total weight of the drugs seized by the Jefferson County Sheriff's Office. Hamper argued that law enforcement had seized more than 500 grams, but fewer than 1.5 kilograms.  (*Id*. at 8.) The Government objected to Hamper's argument and contended that the quantity of methamphetamine calculated in the PSR accurately reflected the total weight of methamphetamine for which Hamper should be held responsible.  (*See* Doc. 51 at 2-6.)

Hamper sought to have Roath removed as counsel of record before the sentencing hearing due to a purported breakdown in the attorney-client relationship.  (Doc. 55.) The Court granted Hamper's motion for substitution of counsel following a hearing.  (Doc. 57.)  The Court appointed Paul Gallardo to represent Hamper on March 6, 2023.  (Doc. 58.)

The Court held a sentencing hearing on May 25, 2023.  (*See* Minute Entry Doc. 61.)  Gallardo maintained the objections to the drug weight that were presented in Hamper's original sentencing memorandum.  (*See* Trans. Doc. 70 at 6-7.) The Government objected to Hamper's position and presented two witnesses

during the hearing: Jefferson County Sheriff Tom Alan Grimsrud and Montana Division of Criminal Investigation Agent Chad Anderberg. (*Id*. at 8-40.) The Court denied Hamper's objections to the drug weight after considering the parties' respective arguments and the witnesses' testimony. (*Id*. at 47-51.)

The Court sentenced Hamper to the Bureau of Prisons for 180 months on Count I and 120 months on Count IV. The Court directed the sentences to run concurrent to each other and concurrent to his state matters. The Court imposed a 5-year term of supervised release. (*See* Minute Entry Doc. 61); (*see also* Judgment Doc. 65.) Hamper timely appealed. (Doc. 67.)

Hamper argued that the Court erred in denying his motion to suppress and maintained that the officers lacked probable cause to search his RV. Hamper also claimed that the Court erred in calculating the weight of the drugs involved for purposes of sentencing. The Ninth Circuit affirmed the suppression ruling and determined the Court had not erred in deciding the drug quantity under the sentencing guidelines. As to the drug quantity, the Ninth Circuit found that the testimonial and documentary evidence presented during Hamper's sentencing hearing confirmed that Hamper's offense involved at least 1.5 kilograms, but fewer than 4.5 kilograms of actual methamphetamine. *See U.S. v. Hamper*, Cause No. 22-1087, Memorandum (9th Cir. May 9, 2024).

### III.   Hamper's Claims

The crux of Hamper's § 2255 claims surround the purported involvement of Christopher M. Cavanaugh ("Cavanaugh") in the transporting and testing of the drugs seized from Hamper's RV. Hamper alleges that Cavanaugh, who signed off on lab reports leading up to the testing of the methamphetamine seized in this federal case in 2022, was the same Cavanaugh, with whom he had a physical altercation in January of 2005 when under state supervision. (*See* Doc. 74 at 2-3.) Hamper claims that his state probation officer, Office Schroeder, along with Cavanaugh, were involved in arresting Hamper for violating the conditions of his supervision and a physical altercation took place.

As a result of the altercation, Cavanaugh incurred a head injury while trying to restrain Hamper. (*Id*.); (*see also* Doc. 85-1.) Hamper alleges that Cavanaugh professed in 2005 that if he were ever able, he would ensure that Hamper was locked up "for the rest of his life." (*Id*. at 3.) Hamper explains his state charges stemming from the altercation were reduced in exchange for Hamper agreeing to drop the excessive use of force charges that he levied against Cavanaugh and other officers. In short, Hamper maintains that Cavanaugh has maintained a vendetta against him since 2005 and that in 2022, Cavanaugh acted on his desire to get revenge by manipulating the drug weights involved in the federal drug investigation. (*Id*. at 4.)

Hamper alleges that he told both Roath and Gallardo of his suspicions that

6

Cavanaugh likely was the very same person involved with the mismatched drug weights. Hamper contends that both counsel ignored his concerns as being either not relevant or unimportant to the disposition of his federal case. (*Id*.) Hamper alleges that he told Roath that Cavanaugh was involved in the 2005 incident which led to his federal sentence being increased due to an escape enhancement. (*Id*. at 2-3.)

Hamper explains that he also advised Gallardo of what had occurred with Cavanaugh and of the requests he had made of Roath to challenge the drug weights and corresponding enhancements. (*Id*. at 3.) Hamper states that Gallardo, like Roath, stated that nothing could be done with the information and that he would need either to take the plea agreement or go to trial. Hamper believes Gallardo was disengaged, did not have adequate time to prepare for sentencing, and failed to adequately challenge the drug weight at sentencing. (*Id*.)

Hamper claims that counsel should have challenged the drug weight discrepancy and the scope of involvement by Cavanaugh. Had they done so and adequately defended him, Hamper believes it would have led to a reduced guideline calculation. (*Id*. at 4, 6-7.) Hamper further suggests that Roath failed to adequately explain the content of the plea agreement. (*Id*. at 6-7.) Hamper claims Gallardo failed to object to the relevant conduct considered at sentencing, resulting in the sentence that was ultimately imposed. Hamper points out that neither Roath

nor Gallardo lodged any objections or corresponding challenges.  (*Id*. at 8-9.) Hamper asserts that he would not have entered a plea agreement and instead would have proceeded to trial had either Roath or Gallardo lodged any objection or challenge and provided effective assistance.  (*Id*. at 5.)  Accordingly, Hamper asserts he suffered prejudice from this alleged ineffective assistance of counsel. (*Id*. at 9.) Hamper explains that it was only after his sentencing hearing that he learned, with the assistance of his family, that the Cavanaugh who handled the drugs in the instant offense was the same person who some 17 years earlier allegedly pledged revenge against Hamper.  (*Id*. at 4.)

As relief, Hamper asks that his sentence be vacated and that he be re-sentenced, presumably by using a lower advisory guideline range.  Hamper asks that the new sentence "reflect an appropriate reduction to compensate for this ineffective representation."  (*Id*. at 10.)

## IV.    Analysis

The Court has considered Hamper's challenge to the validity of his sentence, as well as the responses provided by Roath and Gallardo pursuant to the Court's Order.  (*See* Doc. 77, Doc. 81.)  For the reasons explained below, Hamper's § 2255 motion will be denied, but the Court will issue a certificate of appealability.

### A. Legal Standard

"A prisoner in custody under a sentence of a court established by Act of

Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States [ . . . ] may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  To warrant relief under § 2255, a prisoner must allege a constitutional, jurisdictional, or otherwise "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. Timmreck*, 441 U.S. 780, 783 (1979) (*quoting Bowen v. Johnston*, 306 U.S. 19, 27 (1939)).  In contrast, "[e]rrors of law which might require reversal of a conviction or sentence on appeal do not necessarily provide a basis for relief under § 2255."  *United States v. Wilcox*, 640 F. 2d 970, 973 (9th Cir. 1981).

## B. Ineffective Assistance of Counsel

Hamper claims Gallardo and Roath provided ineffective assistance in various respects.  These claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  At this stage of the proceedings, Hamper must allege facts sufficient to support an inference (1) that counsel's performance fell outside the wide range of reasonable professional assistance, *id*. at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id*. at 694.

To establish deficient performance, petitioner must show that "counsel's

9

representation fell below an objective standard of reasonableness." *Strickland*, at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. *Id*. at 689. In evaluating allegations of deficient performance, the reviewing court's scrutiny of counsel's actions or omissions proves highly deferential. *Id*. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. The petitioner's burden remains to show that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Id*. at 687.

To establish prejudice, a habeas petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id*. As set forth above, although he now claims he would have gone to trial, Hamper does not seek to withdraw his guilty plea. Rather he asks that his present sentence be vacated, and he be sentenced anew. Hamper also seems to suggest that counsels' deficient performance resulted in his guilty plea not being entered voluntarily.

10

Generally, a person who voluntarily and intelligently pleads guilty to a criminal offense may not seek collateral relief in federal habeas proceedings based upon an antecedent constitutional infirmity. *Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973). The Supreme Court explained the approach in *Tollett*:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the [range of competence demanded of attorneys in criminal cases].

*Tollett*, 411 U.S. at 267.

As an initial matter, Hamper does not state what items in the plea agreement Roath failed to explain. (*See e.g.* Doc. 74 at 4-5.) Hamper also fails to provide a rationale for how this purported failure prejudiced him. (*Id*.) The Court presided over the change of plea hearing. During the hearing, the Government outlined the plea agreement. Hamper was sworn as a witness and answered all questions presented to him. Hamper indicated that he understood the charges against him. The Court discussed the plea agreement with Hamper. Hamper stated that he was satisfied with Roath's performance. The Court reviewed the maximum penalties with Hamper as well as all of Hamper's constitutional rights. The Court explained the sentencing process in detail to Hamper. The Court found Hamper to be

11

competent and determined that Hamper entered his guilty pleas voluntarily and knowingly.  (*See generally* Doc. 42.)  The record surrounding the change of plea proceedings does not support Hamper's position.

As set forth above, the Court held a hearing on Hamper's motion for substitution of counsel on March 2, 2023.  The Court granted the motion. At no point did Hamper indicate an intention to withdraw his guilty pleas.  (*See* Minute Entry Doc. 57.)  Following the appointment of Gallardo, Hamper proceeded to a sentencing hearing.  Neither Hamper nor Gallardo made any efforts to withdraw Hamper's guilty pleas, to suggest that the guilty pleas had been entered involuntarily, or to argue that Hamper did not appreciate the consequences of his guilty plea. Hamper has not shown that either counsel provided incompetent advice surrounding the guilty pleas. Hamper may not attack the voluntary nature or his pleas at this juncture.  *See Tollett*, 411 U.S. at 267.

Turning to the substance of his ineffective assistance of counsel clams, aside from Hamper's own unsupported conjecture, no basis exists to believe that Cavanaugh was responsible for the discrepancies in the drug weights involved in Hamper's case.  Likewise, no support exists for Hamper's contention that Cavanaugh was acting on some purported vendetta, announced years before the search and seizure involved in this matter.  Or put another way, nothing of significant relevance existed for either Roath or Gallardo to investigate or

challenge in relation to "Cavanaugh."  To the extent that Hamper wished to do so, he could have proceeded to trial. The choice that Hamper made to enter into a plea agreement does not mean that either Roath or Gallardo performed deficiently or acted outside of the "wide range" of reasonable professional assistance.  *See Strickland* at 689.Similarly, Hamper's claims that Roath and Gallardo both performed unreasonably for failing to challenge the drug weight finds no support in the record.

As reflected in the PSR, and discussed at length during Hamper's sentencing hearing, a discrepancy existed relative to the drug weight. Different law enforcement agencies were involved in the initial search and subsequent seizure of the drugs from Hamper's RV, including the Jefferson County Sheriff's Office ("JCSO"), the Missouri River Drug Task Force, and the United States Drug Enforcement Agency ("DEA").  The JCSO agents initially collected the drug evidence on July 7, 2021. The JCSO agents stored the evidence until agents from the Missouri River Drug Task Force and the DEA retrieved and transported the evidence to the Lewis and Clark County Sheriff's Department on July 12, 2021.

Two of the initial documents listed that a quantity of 1.06 pounds of methamphetamine had been collected.  Along with other smaller quantities of drugs recovered the safe in Hamper's RV, the total quantity was listed as 592.8 grams.  (*See e.g.* PSR Doc. 63 at 28.)  DEA Agent Chad Anderberg was the agent

13

responsible for the transfer of the drug evidence. When the evidence was retrieved from the JCSO, Agent Anderberg signed a form indicating that he retrieved 1.06 pounds of a substance that tested presumptively positive for methamphetamine. Other items were listed on the form reflecting methamphetamine seized from six separate containers. Converted to grams, the quantities totaled 1.31 pounds. The quantities were verified, and Agent Anderberg signed the chain of custody form when the drugs were retrieved from JCSO on July 12, 2021. The evidence list in the DEA report dated July 16, 2021, however, nearly tripled the amount referenced in one of the forms executed by JCSO, significantly affecting Hamper's base level offense under the Sentencing Guidelines. (*Id*. at 29.)

Roath filed several objections to the Presentence Report ("PSR") on Hamper's behalf. Pertinent to this matter, relying on these chain of custody documents, Roath argued that the evidence showed that Hamper only possessed 592.8 grams, or 1.31 pounds, of methamphetamine. Roath filed corresponding objections to this effect. (*See* PSR, Doc. 63 at 28.) Roath maintained the objection and argued the position in detail in Hamper's Sentencing Memorandum. (Doc. 50 at 2-8.)

In response to Hamper's objections, the Government noted that although a JCSO report indicated that only one pound of methamphetamine had been recovered, subsequent investigation revealed there were two quantities of

methamphetamine seized from the cardboard box within Hamper's RV- the initial one-pound quantity and then an additional two-pound quantity, totaling three pounds.  (Doc. 63 at 28.)  The Government contended that photographs and interviews of the officers involved at the scene "make it clear that the total quantity retrieved was 3 pounds." (*Id.*)

As discussed above, Hamper filed a motion for new counsel which the Court granted before his sentencing hearing. Gallardo replaced Roath. The record indicates that Roath provided effective and reasonable assistance in lodging and arguing against the drug weight sought by the Government. Hamper has not provided information from which this Court could infer that Roath's performance fell outside the wide range of reasonable professional assistance.  Contrary to Hamper's present assertions, Roath repeatedly and zealously challenged the drug weight on Hamper's behalf. *See Strickland*, at 687-88.

Gallardo renewed the objection and challenge to the drug weight during the sentencing hearing.  (*See* Trans. Doc. 70 at 6-7.)  Specifically, Gallardo contended that the weight attributable to Hamper should be between 500 grams and 1.5 kilograms.  (*Id.*)  The defense acknowledged that the methamphetamine recovered from a safe located in Hamper's RV, as well as the 1.06-pound bag from the cardboard box in Hamper's RV, were attributable to Hamper but disputed the attribution of an additional 2.79 pounds of methamphetamine recovered from the

RV to Hamper.  (*Id*. at 7-8.)

Sheriff Grimsrud testified at Hamper's sentencing hearing.  Grimsrud explained his role on the day that Hamper had been arrested following the search of Hamper's RV. Grimsrud was involved in recovering the drug evidence and stated that drug evidence was recovered from two separate places: from a safe in the RV and from a cardboard box located between the driver's seat and the safe. (*Id*. at 10-14.)  Grimsrud reviewed the footage obtained from his body camera during the search of Hamper's RV that showed the seizure of the drugs.  (*Id*. at 14-16.)  Grimsrud testified that the safe had been seized, taken to Grimsrud's patrol vehicle, and transported to the Jefferson County Sheriff's Office.  (*Id*. at 16.)

Sheriff Grimsrud then narrated the video that showed the cardboard box from Hamper's RV and explained that two separate plastic bags containing suspected methamphetamine were taken from the box and placed into a single evidence bag.  (*Id*. at 17.)  This evidence bag was also taken to the evidence processing room at Jefferson County Sheriff's Office.  (*Id*. at 18.) Sheriff Grimsrud explained how he logged the evidence from the cardboard box.  Sheriff Grimsrud acknowledged it was a bit confusing, as the initial entry on the government's form reflected an amount of 1.6 pounds of methamphetamine.  Grimsrud explained, however, there were sub-parts of the form reflecting all the methamphetamine seized from the cardboard box. Sheriff Grimsrud noted that the total weight of

evidence Item Number 3, the methamphetamine seized from the cardboard box, was 3.790 pounds.  (*Id*. at 19-20, 23.)

Gallardo cross-examined Sheriff Grimsrud.  (*Id*. at 22-24.)  On cross-examination, Grimsrud conceded that one of the forms submitted reflected that Item Number 3 reflected a weight 1.06 pound of methamphetamine.  (*Id*. at 24.)

Agent Chad Anderberg then testified.  Agent Anderberg explained that a few days after the initial search, he and another Missouri River Drug Task Force agent went to the JCSO and met with Sheriff Grimsrud and an evidence technician before taking custody of the drug evidence.  (*Id*. at 27.)  Agent Anderberg stated that his standard practice is to collect the items, write acquisition reports in the DEA system, and then draft follow-up reports prior to sending suspected drug items to the DEA lab.  (*Id*.)  Agent Anderberg reviewed his reports during his testimony and explained the documentation relating to the drugs taken from the safe and from the cardboard box.  (*Id*. at 28-32.)

Agent Anderberg testified that the DEA tested the suspected methamphetamine seized from Hamper's RV and confirmed that it was indeed methamphetamine.  Agent Anderberg also confirmed that the net weight of the actual drugs was 1685.1 grams, or approximately 1.6 kilos.  (*Id*. at 31.)  On cross-examination, Agent Anderberg testified that he did not view an issue with the evidence seized from the cardboard box. The evidence seized from the cardboard

box consisted of one sealed evidence bag that contained two packages of methamphetamine. Agent Anderberg also testified that on the day of the search of Hamper's RV, he was on scene and observed two vacuum sealed packages of methamphetamine recovered from the RV. (*Id.* at 35-36.) Again, Gallardo effectively cross-examined the agent, (*id.* at 32-29) and presented argument contesting the accuracy of the drug weight. (*Id.* at 43-50.)

The Court overruled Hamper's drug weight objection after having heard the arguments from counsel and considering the testimony and evidence presented,. The Court determined, based upon a preponderance of the evidence submitted at the hearing, that the videos showed the small bags being removed from the safe and two large bags of methamphetamine being removed from the cardboard box. (*Id.* at 50.) Taking into account the testimony of Sheriff Grimsrud regarding what was seized and how he bagged it up, coupled with the testimony from Agent Anderberg about how the items were shipped to the DEA and the contemporaneous reports and descriptions given, there were three quantities of methamphetamine. (*Id.* at 50-51.) These quantities consisted of the two big bags from the cardboard box and the three small bags from safe, in total, roughly 1.6 to 1.7 kilograms as the government alleged. (*Id.* at 51.)

Hamper challenged the drug weight calculation on appeal. As set forth above, the Ninth Circuit affirmed:

> Both testimonial and documentary evidence supported the district court's finding. Deputy Grimsrud's body camera shows him retrieving two bags from a cardboard box and placing both bags in a single Jefferson County Sheriff's Office ("JCSO") evidence bag. Both bags were also reflected in the JCSO evidence log- albeit in a way that was not self-evident. The total drug weight (3.790 lbs.) is consistent with two bags in the amounts of 1.06 lbs. and 2.73 lbs. The DEA documents and Agent Anderberg's testimony further confirm that the DEA received and tested two bags.
>
> The district court did not clearly err in concluding that both bags (weighing 1.06 lbs. and 2.73 lbs.) constituted part of Hamper's offense, and as such, his offense involved at least 1.5 kilograms but less than 4.5 kilograms of actual methamphetamine. *See* U.S.S.G. §2D1.1(c)(2).

*US v. Hamper*, Cause No. 22-1087, *6.

"A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (internal quotation marks and alteration omitted). Nevertheless, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Despite Hamper's suggestion, the record shows that Gallardo was prepared and engaged in the sentencing hearing. Gallardo effectively cross-examined the government's witnesses and obtained certain concessions regarding the discrepancies in the drug logs. Hamper does not point to any specific arguments

19

that Gallardo failed to make on his behalf.  Of the testimony and evidence submitted during the sentencing hearing, there was nothing referencing or indicating direct involvement of "Cavanaugh."  To the extent that Hamper faults Gallardo for failing to make an argument regarding the purported involvement or other nefarious acts of Cavanaugh, there was no reasonable or strategic basis upon which Gallardo could have done so.  In short, Gallardo renewed and advanced the same challenges initially mounted by Roath.  The fact that the argument was ultimately unsuccessful, does not convert the issue into one of defective performance by counsel.  Hamper fails to show Gallardo's performance fell "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.

Even if this Court were to find that counsel performed deficiently under *Strickland's* first prong, Hamper has not shown the attendant prejudice.  The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As set forth above, Hamper does not now seek to withdraw his plea and proceed to trial. He asks to be resentenced in a manner that considers counsel's

20

purportedly deficient performance. Hamper fails to acknowledge that under the applicable Sentencing Guidelines, his advisory range was 292 to 365 months. (*See e.g.* Doc. 70 at 65.) In consideration of Hamper's situation and relevant characteristics, this Court varied downward significantly, 112 months from the low end of the advisory guideline range and imposed a 180-month sentence. This reflects a variance of 9.3 years to Hamper's benefit. Even if this Court would have sustained the defense's objection regarding the drug weight, Hamper's advisory guideline range still would have been 235 to 292 months. Hamper suffered no prejudice by the acts of Roath or Gallardo.

In short, Hamper's mere speculation relative to Cavanaugh or belief that he is entitled to a more lenient sentence does not suffice to undermine the case against him or establish *Strickland* prejudice. *See e.g. Clark v. Lewis*, 1 F. 3d 814, 823 (9th Cir. 1993). Hamper fails to show that either counsel performed deficiently or that he was prejudiced under *Strickland*, his IAC claims are denied.

For all of the reasons set forth herein, Hamper's § 2255 motion will be denied and dismissed.

## V.    Certificate of Appealability

A movant may appeal a district court's dismissal of a § 2255 motion only after obtaining a certificate of appealability from the district court or the circuit court. 28 U.S.C. § 2253( c)(1)(B). "A certificate of appealability may issue …

only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253( c)(2). This standard is satisfied if "jurists of reason could disagree with the district court's resolution of the constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)(*citing Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). Under this standard, the Court concludes that Hamper is entitled to a certificate of appealability. Reasonable jurists could find debatable Hamper's failure to demonstrate entitlement to relief on the claims presented in his § 2255 Motion.

Accordingly, IT IS ORDERED:

1. Hamper's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 74) is DENIED.

2. A certificate of appealability is GRANTED. The clerk shall immediately process the appeal if Hamper files a Notice of Appeal.

3. The Motion to Expedite (Doc. 86) is DENIED as moot.

4. The clerk shall ensure that all pending motions in this case and in CV 25-39-H-BMM are terminated and shall close the civil file by entering judgment in favor of the United States and against Hamper.

DATED this 17th day of July, 2026.

Brian Morris, Chief District Judge
United States District Court